# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM J. FULLER, JR.** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TIMOTHY F. GEITHNER**, | : | **09-2216** |
| **Secretary, Department Of the Treasury** | : | |
| **Defendant.** | : | |

# M E M O R A N D U M

HON. GENE E.K. PRATTER                                             FEBRUARY 25, 2011
U.S. DISTRICT COURT JUDGE

William J. Fuller, Jr. used to work at the United States Mint in Philadelphia. He sued his former employer, Defendant Timothy F. Geithner, Secretary of the United States Department of the Treasury ("the Mint"), after his employment was terminated on March 17, 2007. In his Complaint, Mr. Fuller "asserts that his removal was motivated by discrimination on the basis of his disability" and that the Mint "discriminated against him on the basis of his disability." Compl. ¶¶ 32, 33, ECF No. 1. Following the close of discovery, the Mint filed the Motion for Summary Judgment that is now addressed by the Court.

### Factual and Procedural History[1]

Mr. Fuller began working at the Mint in September 1998 as a metal forming machine operator. In that capacity, Mr. Fuller worked with other individuals, called "die setters", to make

---

[1] The factual history is undisputed unless otherwise noted. Where there is a factual dispute, as long as Mr. Fuller has record support for his position, the facts are viewed in the light most favorable to him.

coin currency using mechanical presses. A metal forming machine operator's duties include emptying the traps of the coins and placing them on a conveyor belt; inspecting coins; and ensuring that the mechanical presses function properly. <u>See</u> Def.'s Statement of Uncontested Facts ¶¶ 1-2 (hereinafter "Def.'s St.").

Mr. Fuller was diagnosed with sleep apnea in 2005. <u>Id.</u> ¶ 21. Initially, he was treated at the Philadelphia Sleep Center. Fuller Dep. 32-33, Dec. 2, 2009, attached as Ex. B to Def.'s Mot. for Summ. J., ECF No. 8 (hereinafter "Fuller Dep."). After this diagnosis, Mr. Fuller was prescribed a CPAP machine and mask to wear while he slept. Def.'s St. ¶ 21. The mask applied pressure to his airway, opening it and allowing Mr. Fuller to inhale more oxygen while he slept. <u>Id.</u> Initially, the mask helped reduce Mr. Fuller's snoring and gave him more energy. <u>See</u> Fuller Dep. 35-36. However, sometime in the middle of 2006, the CPAP machine began to malfunction, which caused Mr. Fuller to unconsciously remove the mask in his sleep because of lack of proper airflow. <u>See id.</u> 30-31. Because of the machine malfunctions, Mr. Fuller had severe fatigue, migraines, and difficulty waking himself up. <u>See id.</u> 38, 74-75. His physician prescribed Mr. Fuller Percocet, Darvocet and Naproxen, all of which masked his symptoms but did not actually address the cause of his condition. <u>See id.</u> 38.

On March 17, 2006, the Mint sent Mr. Fuller a Notice of Proposed Removal, which had been prepared by Mr. Fuller's supervisor, Howard Jackson. Def.'s St. ¶ 3. The Notice stated that between January 19, 2006 and March 17, 2006, Mr. Fuller was absent without leave ("AWOL") for 35 work days, and that he had failed to properly follow formalized Mint leave procedures for every day that he was AWOL. Mem. from H. Jackson to W. Fuller (Mar. 17, 2006), attached as Ex. 1 to Robidoux Decl., attached as Ex. C to Def.'s Mot. for Summ. J. (hereinafter "Robidoux

Decl.").

Mr. Fuller responded to the Notice of Removal by sending a letter to Richard R. Robidoux, the Plant Manager who was the official who decided personnel suspensions and removals. Letter from W. Fuller to R. Robidoux (Apr. 6, 2006), attached as Ex. 2 to Robidoux Decl. In his letter, Mr. Fuller attributed his absences to shingles and to an upper respiratory infection. Id. He stated that he "had been prescribed and was consuming narcotic pain and cough medicine, which motivated incapacitation and lead [sic] to [his] inadvertently not following leave procedures." Id. Mr. Fuller wrote, "As I explained to you during our discussion, I have been overcoming my own illness and trying to do the best I can with another chronic condition that I deal with on a daily basis. Due to the medication intake, I was not fully attentive." Id. Mr. Fuller's letter closed: "Please consider my dilemma in this situation. I accept responsibility for any disciplinary action taken against me, excluding termination of employment. I feel that would be an extremely unfair judgment due to the circumstances of my illness." Id.

On April 6, 2006, Mr. Fuller was offered the opportunity to make an oral reply to the Notice of Proposed Removal. See Mem. from R. Robidoux to S. McDonnell (May 1, 2006 ), attached as Ex. O to Def.'s Mot. for Summ. J. In his oral reply, Mr. Fuller again attributed his absences to shingles and an upper respiratory infection, and also mentioned his girlfriend's health issues and his status as a single parent. Id. He did not mention sleep apnea; nor did he claim that he suffered from a disability. See id.

On May 22, 2006, Mr. Robidoux issued a memorandum suspending Mr. Fuller for 30 days for his failure to properly follow leave procedures. Mem. from R. Robidoux to W. Fuller (May 22, 2006), attached as Ex. 3 to Robidoux Decl. The memorandum specifically noted the

mitigating factors presented by Mr. Fuller in his April 6 oral reply, and it did not reference sleep apnea.  See id.  In addition to his 30-day suspension, Mr. Fuller was placed on a 90-day sick and annual leave restriction beginning May 28, 2006.  Mem. from H. Jackson to W. Fuller (May 22, 2006), attached as Ex. 4 to Robidoux Decl.  To comply with this restriction, Mr. Fuller was required to alert his supervisor or designee within two hours from the start of his shift if he could not report to work, and provide third-party documentation for any sick leave and annual leave. Id.

In or about June 2006, Mr. Fuller contacted the Philadelphia Sleep Center to report that his CPAP machine was malfunctioning, and requested that a technician come to his house to adjust the machine.  Fuller Dep. 30-32.  After a significant delay, he received a new CPAP machine, but was apparently improperly fitted for the mask.  See id. at 32.

At some point after his first period of leave restriction, Mr. Fuller spoke to his immediate supervisor, Charles Krecko, about his medical difficulties.  See Fuller Dep. 57-61.  At his deposition, Mr. Fuller testified about this conversation:

Q.  What did you say to [Mr. Krecko]?

A.  I asked him if there was – that I – I stated to him that I didn't want to get into any more trouble, and that the health issues were causing this to happen to me.  And if there was any way that I could – if I was late, if I was a couple hours late, if I could just stay later or if – if I missed my shift, if I could go a different shift for that day.  Anything – anything to keep me from getting in more trouble.  And they told me that that was not possible and if I didn't follow the rules, I would be disciplined.

Q.  You mentioned the health issues.  What health issues were you talking about with

Charles Krecko?

A.  The sleep apnea and all the symptoms included in that.

Q.  Well, what did you specifically tell him?  I mean, did you mention sleep apnea by name?

A.  Yes.

Q.  Did you discuss the symptoms with him?

A.  Well, he – I discussed what was going on.  Why – like he asked me why – why I couldn't call out or why I was coming in late or why I couldn't call out until it was – if I was going to call out, I couldn't call out until after the time.

And I explained everything to him.  That – about the migraines, about the deep, deep sleep that where I couldn't even be woken up.  Somebody had to come and shake me or slap me in the face to wake me up.

Id. 42-43.  Mr. Fuller contends that in so speaking with Mr. Krecko, he requested an accommodation of a flexible work schedule on account of his sleep apnea-related problems, and that this request was denied.  Pl.'s Statement of Uncontested Facts ¶¶ 46-47 (hereinafter "Pl.'s St.").  Mr. Fuller's attendance did not improve, and so the Mint extended his sick leave restrictions in August 2006 and again in November 2006.  See Def.'s St.¶ 8.  On or around October 3, 2006, Mr. Fuller requested to transfer from the second shift to the third shift, which ran from 11:00 p.m. to 7:00 a.m., because of childcare issues that made the other two shifts unworkable for him.  Id. ¶ 10.  Mr. Fuller's request was granted, and Mr. Krecko talked to him about the importance of coming to work and following leave procedures.  Id.

Between May 22, 2006 and January 29, 2007, Mr. Fuller was absent on unscheduled

leave over 30 percent of the time. Id. ¶ 11. Mr. Fuller's supervisor or co-supervisor recorded his frequent absences and the reasons and documentation he offered for those absences. Id. These unscheduled absences included absences where Mr. Fuller was late to his assigned shift, as well as absences when Mr. Fuller did not show up at all for his assigned shift. Id. On some occasions, Mr. Fuller called before or during his shift to notify his supervisor of his absence; on other occasions, Mr. Fuller failed to call at all. Id.

Mr. Fuller does not dispute these absences, but states that they were causally related to his sleep apnea. Pl.'s Resp. to Def.'s St. ¶ 11. Mr. Fuller testified that his symptoms, and his associated inability to show up for work, were caused by the malfunctioning of the CPAP machine. See, e.g., Fuller Dep. 36-43. In an attempt to wake up on time for work, Mr. Fuller used four alarm clocks, which were sometimes effective in rousing him from a deep sleep. See Fuller Dep. 127. During and around this time period, Mr. Fuller asserts that he provided medical documentation for at least some of his absences, and attaches to his brief copies of the following:

- A doctor's note from July 11, 2006, labeled "excuse slip", requesting that Mr. Fuller be excused from work due to a migraine;

- A doctor's note from August 3, 2006, labeled "excuse slip", requesting that Mr. Fuller be excused from work due to "sleep apnea heat related";

- A doctor's note from December 7, 2006, labeled "excuse slip", requesting that Mr. Fuller be excused from work due to what appears as "HA migraines";

- A doctor's note dated January 29, 2007, labeled "Certificate to Return . . . [illegible]", stating that Mr. Fuller "will be able to return to work on ___" and noting that the "nature of illness or injury" is "sleep apnea/fatigue"; and

- A doctor's note dated February 1, 2007, stating "The above patient is being treated for severe obstructive sleep apnea and suffers from headaches and fatigue - since 8/25."

<u>See</u> Medical Notes, attached as Ex. 6 to Pl.'s Resp. to Def.'s Mot. for Summ. J., ECF No. 13 (hereinafter "Pl.'s Resp.").

Notwithstanding Mr. Fuller's various medical documentation submitted through January 29, 2007, by memorandum dated January 29, 2007, Mr. Krecko sent Mr. Fuller another Notice of Proposed Removal for his failure to follow leave request procedures and for being absent without leave. Def.'s St. ¶ 13. This Notice of Proposed Removal listed five instances when Mr. Fuller had failed to report to work and no one had called in on his behalf. <u>Id.</u> The Notice acknowledged that Mr. Fuller had over 8 years of government service, and that his performance was satisfactory aside from his leave and attendance issues. Mem. from C. Krecko to W. Fuller (Jan. 29, 2007), attached as Ex. 5 to Robidoux Decl.

Again, Mr. Fuller was given the opportunity to make an oral reply to his Notice of Proposed Removal. Def.'s St. ¶ 15; Pl.'s Resp. to Def.'s St. ¶¶ 15-16. This oral reply opportunity was offered on February 22, 2007. <u>Id.</u> Mr. Fuller did not attend in person, but presented a response through his counsel. <u>Id.</u> Plaintiff's counsel stated that Mr. Fuller's medical condition, diagnosed as sleep apnea, had varying degrees of severity and that plaintiff was believed to have suffered a more severe form of that medical condition. Pl.'s St. ¶ 10. The oral reply was later summarized by the Mint in a lengthy written memorandum, which states in pertinent part:

From a health perspective, [Mr. Fuller] suffers from Sleep Apnea and has difficulty

regulating his wake/sleep cycle. Hard to sleep coupled with periods of deep sleep where alarms don't wake him.

Based on some frank discussions with his attorney and family, William Fuller has recently (five days preceding the hearing) focused on taking responsibility for his actions and has modified his schedule to sleep upon return from work, versus address all his other responsibilities and sleep in the evening before waking for his night shift. He has also scheduled a sleep study for March 14th and is trying to get his sleep machine/mask fixed so it is functional. His representative requested that we consider this recognition and change as mitigating circumstances when deciding on his proposed removal.

Mem. from R. Robidoux to S. McDonnell (Feb. 22, 2007), attached as Ex. E to Def.'s Mot. for Summ. J.

On March 12, 2007, three days before Mr. Fuller's sleep study was scheduled to be conducted, Mr. Robidoux sent Mr. Fuller a memorandum notifying him of the Mint's decision to terminate him, effective March 17, 2007. See Mem. from R. Robidoux to W. Fuller (Mar. 12, 2007), attached as Ex. 6 to Robidoux Decl. On March 15, 2007 – two days before the termination became effective – Mr. Fuller's counsel sent a letter to Mr. Robidoux via email and fax, stating that Mr. Fuller had a sleep apnea disability and requesting that the termination decision be postponed until Mr. Fuller's sleep study was concluded. See Letter from D. Friedman to R. Robidoux (Mar. 15, 2007), attached as Ex. 7 to Robidoux Decl. The letter also stated:

I may not have sufficiently stressed the critical nature of Mr. Fuller's disability and his efforts to address his medical condition, so that he could continue being a productive

employee at the Philadelphia Mint. . . . [I]n Mr. Fuller's case, his condition is significant and severe. Mr. Fuller, as a [sic] obstructive sleep apnea sufferer, experiences periods of oxygen deprivation [and] REM sleep deprivation . . . . His condition can lead to heart arrhythmias, stroke or heart attack.

As I had explained to you, during the oral reply, Mr. Fuller has actively and aggressively taken steps, through diagnostic procedures and medical treatment, to address his disability and effectively deal with that disability. I also had mentioned to you that Mr. Fuller's absences were sometimes caused by his falling into an uncontrolled deep sleep from which he was unable to be aroused, because of exhaustion and REM sleep deprivation

Id. On the same day that his counsel sent that letter, March 15, 2007, Mr. Fuller participated in the sleep study, which confirmed that he had severe obstructive sleep apnea. See Letter from C. Rosenberg to M. Williams (Mar. 27, 2007), attached as Ex. J to Def.'s Mot. for Summ. J. The University Services Sleep Disorder Center prescribed a new CPAP mask for Mr. Fuller and told him to return for a check-up in one year. Id.

On March 16, 2007 – one day before Mr. Fuller's termination was scheduled to become effective – Mr. Fuller's counsel emailed Mr. Robidoux and again asked him to reconsider the decision to terminate Mr. Fuller. Email from D. Friedman to R. Robidoux (Mar. 16, 2007), attached as Ex. 7 to Robidoux Decl. In the email, counsel made points that were similar to those contained in his March 15 letter. See id. Counsel further stated that:

during [the oral reply] I had informed you that Mr. Fuller, with his family support had been developing strategies to effectively deal with the underlying attendance problem. I

9

had hoped that you would have favorably considered the demonstrated positive trend in

Mr. Fuller's attendance since the oral reply meeting.  I do not believe that there had been

any periods of unauthorized absence.

Id.

Notwithstanding the correspondence from Mr. Fuller's counsel, Mr. Fuller's termination

became effective on March 17, 2007.  Upon being terminated, Mr. Fuller properly filed a

complaint with the agency "alleging that his removal was motivated by discrimination on the

basis of disability (Obstructive Sleep Apnea)."  Compl. ¶ 9.  Upon the agency's issuance of a

final decision of no discrimination, Compl. ¶ 11, Mr. Fuller appealed to the Merit Systems

Protection Board, Compl. ¶ 12.  After a hearing, an administrative judge affirmed the agency's

removal action and denied Fuller's affirmative defense of discrimination on the basis of

disability.  Compl. ¶ 13.  The MSPB denied Mr. Fuller's petition for review of this decision, and

Mr. Fuller then filed the instant civil action seeking a trial de novo on his discrimination claim.

Compl. ¶¶ 14-15, 32-33.  After the close of discovery, the Mint moved for summary judgment.

**Legal Standard**

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment may be granted only if

the moving party persuades the district court that "there exists no genuine issue of material fact

that would permit a reasonable jury to find for the nonmoving party."  Miller v. Ind. Hosp., 843

F.2d 139, 143 (3d Cir. 1988). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" only if it could affect the result of the suit under governing law. Id.

Evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 217, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment, here Mr. Fuller, must support each essential element of his opposition with concrete evidence in the record. Celotex, 477 U.S. at 322-23. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 642 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).


**Discussion**

In his Complaint, Mr. Fuller contends that "his removal was motivated by discrimination on the basis of his disability" and requests that the Court find that the Mint "discriminated

11

against him on the basis of his disability".  Compl. ¶¶ 32, 33.   This case, then, clearly presents

the issue of whether Mr. Fuller's *termination* was motivated by discrimination.  Substantially less

clear, and discussed *infra* in greater detail, is whether Mr. Fuller contends that the Mint

discriminated against him by failing to accommodate his disability and/or by failing to engage in

the interactive process in good faith.

Because he was a federal employee, Mr. Fuller must bring his discrimination claim/s

pursuant to the Rehabilitation Act, which "forbids employers from discriminating against persons

with disabilities in matters of hiring, placement, or advancement." Shiring v. Runyon, 90 F.3d

827, 830-31 (3d Cir. 1996) (stating the "Rehabilitation Act . . . is applicable only to federal

employers . . . .").


Removal Motivated by Discrimination

Where, as here, a plaintiff has adduced no direct evidence of discrimination, claims

brought under the Rehabilitation Act are analyzed using the so-called *McDonnell-Douglas*

burden-shifting framework.  Venter v. Potter, 694 F. Supp. 2d 412, 421-22 (W.D. Pa. 2010); see

also Wishkin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007) (using the *McDonnell-Douglas*

framework to analyze a discrimination claim brought under the Rehabilitation Act).[2]

_____

[2] The Court notes that while the Mint's Brief in support of summary judgment follows the
*McDonnell-Douglas* burden-shifting framework, Mr. Fuller's Brief does not.  Instead, Mr.
Fuller's Brief seems largely to address only the elements of a *prima facie* case of disability
discrimination under this framework.  The Court further notes that Mr. Fuller has never argued
that the *McDonnell-Douglas* burden-shifting framework would not apply to the instant issues and
that Mr. Fuller's counsel went so far as to address the evidence his client would rely upon to
show pretext.  See Oral Arg. Tr. 22-23, July 6, 2010, ECF No. 16.  Furthermore, Mr. Fuller has
presented no evidence that is "so revealing of discriminatory animus that it is not necessary to
rely on any presumption" that the Court could consider it direct evidence of discrimination and,

Under this framework, the plaintiff must first make out a prima facie showing of discrimination. Wishkin, 476 F.3d at 185. Upon the establishment of a prima facie case, the burden then shifts to the employer to articulate some "legitimate, nondiscriminatory reason for the employment action." Id. In identifying a legitimate, nondiscriminatory reason for the action, the employer rebuts the presumption of discriminatory action raised by the prima facie case. Id. "[T]he plaintiff must then be afforded an opportunity to show that the employer's stated reason for the employment action, such as plaintiff's rejection or separation, was pretextual." Id. A plaintiff may demonstrate pretext, and so defeat a motion for summary judgment, by either "(i) discrediting the employer's proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

The Court's analysis follows this conventional framework.


The *Prima Facie* Case

To make out a *prima facie* case of discrimination under the Rehabilitation Act, an employee bears the burden of demonstrating "(1) that he or she has a disability; (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job." Wishkin, 476 F.3d at 184-85 (quoting Shiring, 90 F.3d at

_____

as a result, eschew the *McDonnell-Douglas* burden-shifting framework. See Venter, 694 F. Supp. 2d at 422 n.6 (quoting Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1096 (3d Cir. 1995)).

831).  "The existence of a prima facie case of employment discrimination is a question of law that must be decided by the court but the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied."  Id. at 185 (citing Sarullo v. United States Postal Serv., 352 F.3d 789, 797-98 (3d Cir. 2003) (per curium)).

Given that Mr. Fuller clearly was terminated, only the first two elements of the *prima facie* case are disputed by the Parties.  Specifically, the Mint argues that Mr. Fuller is not disabled on account of his sleep apnea under Sutton v. United Air Lines, 527 U.S. 471, 482 (1999), because he does not manifest any symptoms of sleep apnea when his CPAP mask and machine are properly functioning.[3]  The Mint further argues that even if Mr. Fuller's sleep apnea is considered a disability, Mr. Fuller is not an otherwise qualified individual for purposes of the Rehabilitation Act.  The Mint contends that Mr. Fuller is not "otherwise qualified" because he did not perform an essential function of his job, i.e., regular attendance, in light of his being absent 30 percent of the time.

*a. Whether Mr. Fuller had a Disability*

For purposes of the Rehabilitation Act, an individual has a disability when he has "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an

---

[3] "'Congress legislatively overturned Sutton in the ADA Amendments Act of 2008, Pub. L. No. 110-325,122 Stat. 3553, 3556 (2008). However, the ADA Amendments Act of 2008 is not retroactive. Seibert v. Lutron Elecs., No. 08-5139, 2009 WL 4281474, at *7 n.6 (E.D. Pa. Nov. 30, 2009).'" Keyes v. Catholic Charities of the Archdiocese of Philadelphia, No. 09-1887, 2010 WL 290513, at *5 n.3 (E.D. Pa. Jan. 20, 2010)

impairment." Wishkin, 476 F.3d at 185 (citing 29 U.S.C. § 705(20)(B)). Mr. Fuller contends that on account of his sleep apnea disability, he was substantially limited in his major life activity of sleeping.

Regulations issued by the Equal Employment Opportunity Commission, to which courts can look for guidance in interpreting the terms of the Act, see Williams v. Philadelphia Housing Authority Police Dep't, 380 F.3d 751, 762 n.7 (3d Cir. 2004), provide that "major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working", 29 C.F.R. § 1630.2(i). Here, Mr. Fuller asserts that in the last year of employment at the Mint, his sleep apnea substantially limited him in the major life activity of sleeping. The Mint does not contest that sleeping is a major life activity. Oral Arg. Tr. 5.

The Court then turns to the question of whether Mr. Fuller was "substantially limited" in his sleeping. "In assessing whether a major life activity is substantially limited, a court should consider the following factors: '[t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'" Keyes v. Catholic Charities of the Archdiocese of Philadelphia, No. 09-1887, 2010 WL 290513, at *4 (E.D. Pa. Jan. 20, 2010) (quoting 29 C.F.R. 1630.2(j)(2)(i)-(iii)). Whether a major life activity is substantially limited – and therefore, whether a person has a disability – is an individualized inquiry. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999). The Supreme Court in Sutton held that courts must refer to mitigating or corrective measures that are *in use* to address a particular medical condition, when inquiring whether that condition constitutes a disability. Id.

at 482.

The Mint argues that Mr. Fuller's sleep apnea is not a disability under <u>Sutton</u> because Mr. Fuller uses the "mitigating measure" of a CPAP machine, and he does not experience sleep apnea symptoms when he is successfully using the machine. <u>See</u> Def.'s Br. at 18-20. Further, the Mint argues that Mr. Fuller has not adduced sufficient evidence to create an issue of fact regarding a substantial limitation of the major life activity of sleeping due to sleep apnea consistent with this Court's consideration of ADA claims for sleep apnea. <u>See id.</u> at 20-21. Mr. Fuller, in opposition, contends that he has presented sufficient evidence to show that his sleep apnea substantially limited his ability to sleep. <u>See</u> Pl.'s Resp. at 4-7.

Mr. Fuller testified at his deposition that he was diagnosed with sleep apnea in 2005, when he went to the Philadelphia Sleep Center to seek a consultation about his snoring. <u>See</u> Fuller Dep. 33-36. Some time in 2006, the CPAP machine that had been prescribed to help with his sleep apnea started malfunctioning. <u>Id.</u> 36-38. According to Mr. Fuller, when his machine started malfunctioning, he "was having headaches to where it was bringing tears to [his] eyes" and his "mom and father had to come over and shake [him] to wake [him] up. [His] lips would turn blue, [and his] his cheeks would go numb." <u>Id.</u> 37. As a result of the headaches, Mr. Fuller "was prescribed Percocet, Darvocet, and naproxen. So three different things for the migraines." <u>Id.</u> 38. Furthermore, when "the machine malfunctions, that's when [he] would have that severe fatigue . . . . [He] would wake up and talk to people, not even know [he] would talk to them. It was like sleepwalking; [he] wouldn't even be aware." <u>Id.</u> 74-75. Mr. Fuller used four alarm clocks in order to wake up, a technique that did not always work. <u>See id.</u> 127. When he skipped his afternoon nap in order to combat his attendance problems related to his sleep apnea, Mr.

Fuller testified that he "couldn't function in work. . . . [He] could function, but [he] was really tired and [he] couldn't do . . . [his] job as well." Id. 137. During this period "[he] was tired, [he] was dragging . . . like a walking zombie." Id. 138.

In Keyes, a recent case from this District, the Court found that the plaintiff who was later diagnosed with sleep apnea "failed to establish a triable issue of fact as to whether he was substantially limited in the major life activity of sleeping" where he had specifically testified that he suffered daytime fatigue occurring at intervals, that his drowsiness could be helped by a cup of coffee, and that his snoring disturbed his wife. See Keyes, 2010 WL 290513, at *6. Unlike the plaintiff in Keyes and as detailed above, Mr. Fuller has testified here that when his sleep apnea was acute, he was incapable of waking up in spite of using four alarm clocks; that his lips would turn blue and his cheeks numb from a lack of oxygen; and that his sleep apnea caused him to suffer debilitating migraine headaches.

In light of Mr. Fuller's testimony regarding the physical manifestations of his sleep apnea, the Court, viewing this evidence in the light most favorable to Mr. Fuller, finds that he has offered a triable issue of fact as to whether his major life activity of sleeping was substantially limited such that he is disabled for purposes of the Rehabilitation Act.[4]

---

[4] In Keyes, the Court also noted that the plaintiff's sleep apnea "responded well to treatment with a CPAP machine" that he started using only after his employment was terminated, and appeared to consider this a factor in determining that the plaintiff did not have a substantial impairment to a major life activity. Keyes, 2010 WL 290513, at *3, *6. The Court here does not consider Mr. Fuller's subsequent positive response to a new CPAP machine in its analysis of whether he has offered a triable issue of fact as to whether he was substantially limited in the major life activity of sleeping at the time of the alleged discrimination.

Although the symptoms of Mr. Fuller's sleep apnea were ameliorated by his use of a working CPAP machine, at the time of the events at issue Mr. Fuller testified that the symptoms continued unabated. The Mint, relying on Sutton v. United Airlines, urges the Court to find that the ultimate success of the corrective measure mandates a finding of no substantial impairment.

*b. Whether Mr. Fuller was Otherwise Qualified for the Position*

In addition to establishing a triable issue of fact as to whether he has a disability, Mr. Fuller must also establish a triable issue of fact as to whether he was "otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation" by the Mint to make out his *prima facie* case.  See Wishkin, 476 F.3d at 185; see also Shiring, 90 F.3d at 832 ("the burden is on the employee to prove that he is an 'otherwise qualified' individual").

An employee is otherwise qualified if the employee (1) "has the requisite skill, experience, education and other job-related requirements of the position" and (2) "with or without reasonable accommodation, can perform the essential functions of that position."  Turner v. Hershey Chocolate USA, 440 F.3d 604, 611 (3d Cir. 2006) (citing 29 C.F.R. § 1630.2(n)).  To determine the "essential functions" of a position, the Court may consider, *inter alia*, evidence of (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising for the job; and (3) the consequences of not requiring the incumbent to perform the function.  Id. at 612.  "When the employee contends that he would be otherwise qualified with reasonable accommodation, it falls to the employee to make at least a facial showing that such accommodation is possible."  Shiring, 90 F.3d at 832.

Here, the Mint argues that Mr. Fuller was not an "otherwise qualified" employee because he could not regularly attend his scheduled shifts, and regular attendance is an essential function

_____

In Sutton, plaintiffs were found to be not disabled for purposes of the ADA because the glasses they wore at the time they applied for and were rejected from pilot positions completely "corrected" their vision.  See 527 U.S. at 488.   Mr. Fuller's situation is thus distinct from that of the plaintiffs in Sutton, as at the time Mr. Fuller was not successfully using a corrective measure at the time he experienced his adverse employment action.

of the metal forming machine operator position. Def.'s Br. at 21-23. In support of its assertion

that regular attendance is an essential function of the position of a metal forming machine

operator, the Mint relies upon the affidavit of Richard Robidoux, in which Mr. Robidoux states

that the absence of machine operators results in lowered productivity by the entire production

line, disrupting the function of the Mint and causing it to fall behind in its efforts to meet its

production goals. See Robidoux Decl. ¶¶ 17-18; see also Krecko Decl. ¶¶ 15-16, attached as Ex.

D to Def.'s Mot. for Summ. J. The Court notes that while the job description for a metal forming

machine operator submitted by the Mint does not expressly identify attendance as a job

requirement, the responsibilities that are described all necessarily depend upon the individual so

hired in fact being present at the Mint and working on the machines. See Position Description,

attached as Ex. L to Def.'s Mot. for Summ. J.

Contesting the Mint's assertion that attendance is an essential function of Mr. Fuller's

job, although it is not apparent from Mr. Fuller's briefing, at the hearing Mr. Fuller's counsel

noted that there is no actual evidence, aside from the affidavits of the Mint managers, "that

productivity was affected at all" by Mr. Fuller's absences. Oral Arg. Tr. 23. Mr. Fuller's counsel

further noted Mr. Fuller's testimony that backup individuals fill in when an employee was absent,

and that Mr. Fuller was never informed that his absence harmed productivity or the meeting of

the Mint's production goals. Id. 24; see also Fuller Dep. 51- 53 (testifying about his observation

of the lack of impact on production when individuals were absent).

Mr. Fuller also appears to contend that he was an otherwise qualified individual because

the reasonable accommodation of a flexible schedule would have allowed him to address his

attendance issues. Mr. Fuller testified that he requested a flexible schedule which would allow

him to, at times where his sleep apnea was particularly bad, cover eight hours at the Mint from any point at which he arrived. See Fuller Dep. 59-60. Mr. Fuller appears to have requested this because the Mint was open and running 24 hours a day, so that he proposes that he might be able to work at any time. See id. The Court is certainly not surprised, or even unmoved, by the Mint's arguments in its briefs that such an accommodation would not be a reasonable proposal at a manufacturing facility such as the Mint, where shifts would need to be reliably and regularly planned. However, the Mint does not specifically identify record evidence, aside from the affidavit of Mr. Robidoux which mentions that a "flexible time work schedule would not be effective or efficient", supporting its contention. Therefore, an indulgent reading of Mr. Fuller's evidence requires the Court to consider his proposal a reasonable accommodation that could have permitted him to address his attendance issues.

To be sure, courts have held that attendance is an essential function of a job. See Schierhoff v. GlaxoSmithKline Consumer Healthcare L.P., 444 F.3d 961, 966 (8th Cir 2006) ("an employee who cannot attend work cannot perform the essential functions of his job"); EEOC v. Yellow Freight System, Inc., 253 F.3d 943, 948 (9th Cir. 2001) (noting that every circuit to address the issue has held that "in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability"). This Court does not disagree with this sensible proposition. However, while the adduced evidence is arguably weak, Mr. Fuller has nevertheless presented minimally sufficient evidence to raise a triable issue of fact as to whether he was otherwise qualified for his position with a reasonable accommodation such that resolution of this issue in this case remains the proper provenance of a jury.

As Mr. Fuller has raised triable issues of fact as to his disability and as to whether he was an otherwise qualified individual, he has established his *prima facie* case of discrimination.

The Legitimate, Nondiscriminatory Reason

As explained above, upon the establishment of a *prima facie* case, the burden then shifts to the employer to articulate some "legitimate, nondiscriminatory reason for the employment action." Wishkin, 476 F.3d at 185. Although Mr. Fuller contends that "the material issue in this case is not whether [he] engaged in misconduct which supported a termination action", Pl.'s Resp. at 1, that information is material to the Mint's asserted legitimate reason for Mr. Fuller's termination, notably his year-long history of absenteeism. The Mint marshaled competent evidence, evidence that is largely unrebutted by Mr. Fuller, that Mr. Fuller had substantial problems arriving at work on time, if he arrived at all. See, e.g., Mem. from H. Jackson to W. Fuller (Mar. 17, 2006), attached as Ex. 1 to Robidoux Decl.; Mem. from H. Jackson to W. Fuller (May 22, 2006), attached as Ex. 4 to Robidoux Decl.; Mem. from C. Krecko to W. Fuller (Jan. 29, 2007), attached as Ex. 5 to Robidoux Decl.; Attendance Log (Oct. 13, 2006 - Feb. 8, 2007), attached as Ex. 1 to Krecko Decl.

The Mint amply articulates a nondiscriminatory reason for terminating Mr. Fuller. Notably, after serial warnings and escalating punishments, Mr. Fuller continued to fail to arrive at work, or to call within a specific period of time when he found himself unable to come to work. See Mem. from C. Krecko to W. Fuller (Jan. 29, 2007), attached as Ex. 5 to Robidoux Decl.; Mem. from R. Robidoux to W. Fuller (Mar. 12, 2007), attached as Ex. 6 to Robidoux Decl. This evidence presents a legitimate, nondiscriminatory reason for terminating Mr. Fuller's

employment.

Pretext

Because the Mint established a legitimate, nondiscriminatory business reason for Mr.

Fuller's discharge, and so rebutted the presumption of discrimination established by Mr. Fuller's

*prima facie* case, Mr. Fuller must then delineate evidence that shows the Mint's proffered

business reason is merely a pretext for discrimination.  See <u>Wishkin</u>, 476 F.3d at 185.  Mr. Fuller

may demonstrate pretext, and so defeat the Mint's motion for summary judgment, by pointing "to

some evidence, direct or circumstantial, from which a factfinder could reasonably either (1)

disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action."  <u>Fuentes</u>, 32 F.3d at 764.

In neither his Response in Opposition nor his Supplemental Memorandum of Law does

Mr. Fuller argue what specific evidence demonstrates that the Mint's proffered reason for Mr.

Fuller's termination – his chronic absenteeism – was a pretext and that the Mint's action was

more likely than not motivated by discrimination.[5]  However, during the oral argument on the

summary judgment motion, Mr. Fuller's counsel responded to the Court's query about evidence

of pretext by noting that "the Mint ignored the obligations under disability law.  When the Mint

was charged with actual knowledge that an individual was claiming that his misconduct was

---

[5] The Court also considers evidence "used to establish a prima facie case of
discrimination", as it "may also be relied upon to demonstrate pretext, since nothing about the
*McDonnell Douglas* framework requires a court to ration the evidence presented in a particular
case among the prima facie and pretext stages of the plaintiff's case."  <u>Venter</u>, 694 F. Supp. 2d at
423.

causally and directly related to a disability . . . then the Mint was under an obligation under ADA law to address that." Oral Arg. Tr. 22-23.

Mr. Fuller contends that he first made Mint management aware of his sleep apnea issues in 2006, and that his request for a flexible schedule was denied. See Fuller Dep. 41-44, 59-61. Mr. Fuller's counsel raised the issue of the extent to which Mr. Fuller's sleep apnea affected his work attendance at the February 22, 2007 oral response to the January 29, 2007 Notice of Proposed Removal. Pl.'s St. ¶¶ 10-11. Mr. Fuller argues that the Mint had an opportunity to change its termination decision once it had been notified by his counsel in both a letter and an email that Mr. Fuller contended that his sleep apnea rose to the level of a disability such that the Mint should at least forbear from executing its final decision on the Notice of Proposed Removal until the results of Mr. Fuller's sleep test came back. See generally Pl.'s Reply at 3-4, ECF No. 19. That the Mint chose not to hold its termination decision in abeyance, particularly after it received the information provided by Mr. Fuller's counsel, could perhaps be considered circumstantial evidence that discrimination was more likely than not the animating spirit of the Mint's termination of Mr. Fuller.[6]

Furthermore, Mr. Fuller arguably seeks to discredit the Mint's stated reason for his termination – chronic absenteeism – by showing that the workings of the Mint were largely unaffected by his absence. Mr. Fuller testified that it was his belief there were sufficient individuals on hand to cover his position on those days when he was absent. See Fuller Dep. 51-

---

[6] Mr. Fuller also testified that the Mint did not offer him a "last-chance agreement", a suspension agreement that included subsequent specific attendance requirements, used with other employees who had attendance problems. See Fuller Dep. 64-66 (recognizing, however, that his sleep apnea was such that he likely could not have adhered to the attendance requirements of such an agreement).

53.  Mr. Fuller suggests that productivity and the general working of the Mint were not affected by his attendance difficulties.  <u>See</u> Pl.'s St.¶ 48.

The Mint asserts that Mr. Fuller's absenteeism was excessive, so much so that "[e]ven if this Court were to assume that all of plaintiff's absences in 2006 and early 2007 were the result of sleep apnea, the Mint was justified in terminating the employee."  Def.'s Br. at 28.  The Mint also argues that Mr. Fuller's "sleep apnea was not known by his supervisor at the time he initiated the proposed removal and was only fleetingly raised before the Plant Manager before he made the decision to terminate plaintiff."  <u>Id.</u> at 29.  Thus, the Mint contends that Mr. Fuller has not discredited its asserted legitimate, nondiscriminatory reason for terminating him.  <u>See id.</u> at 28-29.

Taking Mr. Fuller's contentions as legitimate, that the workings and productivity of the Mint were unaffected by his absence, it is feasible that Mr. Fuller has arguably discredited the Mint's argument that his absenteeism caused such problems as to justify the termination.  In lieu of identifying other evidence on the record that raises a material issue of fact as to Mr. Fuller's absences, the legitimate, nondiscriminatory reason for his termination identified by the Mint, Mr. Fuller instead identifies an opportunity not taken by the Mint once it definitely knew of the problems associated with Mr. Fuller's sleep apnea as circumstantial evidence that the Mint's actions were motivated by discrimination against him because of his disability.

Though mindful that the Court is obligated in reviewing a motion for summary judgment to make every reasonable inference in favor of the non-moving party, inferring discriminatory motivation from a failure to amend a termination decision nearly overtaxes this Court's indulgent reading of Mr. Fuller's arguments and of the record presented for the Court's review.  However,

it is *possible* that a reasonable finder of fact, when faced with the conflicting testimony and statements regarding Mr. Fuller's notice to management of his sleep apnea and associated problems, his request for an accommodation, the reasonableness of this request, and the effect of his absence on the Mint's productivity, could find Mr. Fuller more credible than the representatives of the Mint, such that the finder of fact could then "rationally disbelieve defendant's proffered legitimate reasons". See Disante v. Henderson, No. 98-5703, 2000 WL 250225, at *7-9 (E.D. Pa. Mar. 2, 2000) (finding that there was "sufficient evidence in the record to permit a reasonable fact finder rationally to disbelieve defendant's proffered legitimate reasons" where plaintiff identified deposition testimony, both his own and that of other employees, that contradicted defendant's version of events and reasons for terminating plaintiff).

Therefore, the Court must deny the Mint's Motion for Summary Judgment.

Failure to Provide Reasonable Accommodation

"Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999). Once an employee has requested an accommodation, the employer has a duty under the Rehabilitation Act to engage in an "interactive process" aimed at designing a reasonable accommodation for the employee's disability, if possible. See id. at 311 (citing 29 C.F.R. Pt. § 1630, App. § 1630.9 at 359). "The goal of the interactive process is to help identify the precise limitations of the employee's disability and the potential options that could reasonably accommodate those limitations." Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000).

Both parties bear responsibility in this process.  <u>Taylor</u>, 184 F.3d at 312.

While Mr. Fuller testified in his deposition that he spoke with his managers about his sleep apnea-related attendance problems and asked whether he might have a flexible schedule, <u>see, e.g.</u>, Fuller Dep. 41-44, he does not expressly allege in his Complaint that the refusal of his managers to put him on a flexible schedule constituted a failure to accommodate.  Nor does he expressly allege that the Mint failed to engage in the "interactive process".  Mr. Fuller only alleges that "his removal was motivated by discrimination on the basis of disability" and includes in his prayer for relief a request "that the Court find that [the Mint] discriminated against him on the basis of his disability."  Compl. ¶¶ 32, 33.  In its Memorandum of Law in Support of its Motion for Summary Judgment, the Mint addresses a failure to accommodate claim, but states "this claim is not properly before this Court."  Def.'s Br. at 23.  After an intensive review of the parties' papers, the Court cannot identify a rebuttal by Mr. Fuller to the Mint's argument that a failure to accommodate claim is not properly before the Court.  Mr. Fuller does, however, brief the issue that "the defendant failed to engage in the interactive process" but without any reference to specific allegations in the Complaint.  See Pl.'s Resp. at 9-11.

The Court's review of caselaw reveals that failure to engage in the interactive process can either be considered evidence of a failure to accommodate, <u>see</u> <u>Hohider v. United Parcel Service, Inc.</u>, 574 F.3d 169, 192-94 (3d Cir. 2009), or be considered a stand alone claim sounding in the breach of a duty to engage in that process in good faith, <u>see, e.g.</u>, <u>Parker v. Verizon Pennsylvania, Inc.</u>, 309 F. App'x 551, 560-62 (3d Cir. 2009) (describing the *prima facie* case where a plaintiff alleges that "that an employer failed to participate in the interactive process").  In both contexts, however, the failure to accommodate or failure to engage in the interactive process is a

separately-alleged claim.  See Barclay v. Amtrak, 240 F. App'x 505, 508 (3d Cir. 2007) (addressing "Barclay's second *claim* (reasonable accommodation)") (emphasis added); Williams, 380 F.3d at 772 ("in addressing an employee's *claim* that an employer failed to engage in the interactive process") (emphasis added); Taylor, 184 F.3d at 319-20 (describing what a plaintiff must demonstrate to show that an employer failed to participate in the interactive process).

Given that Mr. Fuller does not expressly advance a separate claim for failure to accommodate or failure to engage in the interactive process, and because he did not contest the Mint's contention that no such claim is before the Court, the Court will not consider Mr. Fuller's arguments on this issue.  Furthermore, as this litigation proceeds, no such claim is part of this case.

## Conclusion

For the reasons discussed above, the Court must deny the Motion for Summary Judgment of the Mint.  An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
UNITED STATES DISTRICT JUDGE